IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
Plaintiff,
v.
GONZALO LIRA, JR.,
Defendant.

No. 09-10011-WEB

**Memorandum and Order**

This matter came before the court on May 5, 2009, for a hearing on the defendant's Motion to Suppress Evidence (Doc. 16). The court took the motion under advisement at the conclusion of the hearing. For the reasons that follow, the motion is denied.

I. *Facts*.

The court finds the following facts from the evidence presented at the hearing. Detective Bryan Martin of the Wichita Police Department is assigned to the narcotics section as a K-9 handler. On January 28, 2009, Martin spoke by telephone with Sal Mares, the owner of Mares Bus Lines, a bus company based in Texas that specializes in serving Hispanic passengers. The company has a route that goes through Wichita, where the bus stops at a restaurant parking lot to drop off and take on passengers. Mr. Mares had called the Wichita police to report suspicions about a bus passenger named Gonzalo Lira, whom he said frequently rode the Mares bus line from Wichita to Chicago. Mares was apparently concerned the individual might be involved in drug trafficking, although he did not specifically mention drugs in his conversations with Martin. Mares said the man had ridden the bus several times in the month of January, although he

couldn't say for sure how many times because a seat had frequently been reserved for him under a different name. He said the way the man was acting and his mannerisms had raised suspicions among drivers, mentioning specifically that a driver had reported an incident where the bus had been boarded by police officers, and Lira had moved about from one area of the bus to another, staying away from the bag he had brought, but always keeping an eye on the bag.

Mares told Detective Martin the bus would be picking up passengers at the restaurant in Wichita the next day, on January 29, 2009, and that a seat had been reserved for Mr. Lira. Martin discussed and obtained approval from Mares for the police to meet the bus in Wichita to investigate. They agreed that once the bus arrived at the Wichita city limits, the driver would call Mr. Mares, and Mares would in turn call Detective Martin to let him know. Martin planned to meet the bus while it was stopped at the restaurant parking lot and conduct a "dog sniff" of the baggage on the bus. On the afternoon of the 29th, Mares again talked to Detective Martin by phone and told him the bus had already arrived, explaining that the driver had neglected to call when he first reached the city limits. As a result, the bus was already at the restaurant loading passengers. Mares told Martin the bus driver was expecting the police. Martin and other officers proceeded to the restaurant, arriving at around 4:45 p.m., but by that time the bus was already loaded and was pulling out of the parking lot. Martin turned his car around and followed the bus. He testified that as he followed, he saw the bus fail to signal as it made a turn.

Martin turned on his emergency lights and stopped the bus, which pulled over to the side of the street. Marten spoke to the driver and told him he had failed to signal. Almost immediately, he asked the driver for consent to search the baggage compartment in the undercarriage of the bus. Martin testified that the driver seemed aware the police were going to

contact him, and he consented without hesitation to a search. Martin also asked the driver for permission to allow Officer Eddie Padron to get on the bus. The driver said it was no problem, and Padron stepped up into the bus. The driver told Martin the person they were looking for was on the bus. Padron stayed on the bus while Detective Martin got off. Padron did not block the aisle, although none of the passengers got on or off the bus after Padron entered.

Detective Martin retrieved his K-9 "Rex" from the car. After the bus driver opened up the exterior cargo compartment doors along the undercarriage of the bus, Martin sent the dog in and allowed him search. Martin had worked with Rex for five or six years, and at the time of the search Rex and Martin had current training certifications from the Kansas Police Dog Association and the Kansas Highway Patrol in the detection of marijuana, methamphetamine, cocaine, and heroin. Martin estimated that Rex's accuracy rate was about 85-90% in prior years and even higher in the current year.[1] Martin testified that as soon as Rex went into the compartment, his behavior change was obvious, indicating to Martin that the dog had detected an odor of narcotics. The dog first went toward the back of the compartment, and then backed out and worked his way toward the front. At the front of the compartment, Rex "indicated" on a particular bag by scratching at it, which led Martin to conclude that the dog had located the source of the narcotics odor and that the bag contained drugs. The bag was a red soft-sided nylon bag with handles on it. It had a claim check with the number 6800. As the court understands the evidence, the bag also had contained an identification tag with the defendant's

---

[1] The defense was provided with the dog's current certification and was able to cross-examine his handler, Detective Martin, at the suppression hearing. Defendant's Motion for K-9 Discovery (Doc. 17) is granted to that extent. Defendant has shown no basis for discovery of the additional voluminous materials he requested. *See United States v. Lambert*, 351 F.Supp. 1154, 1162 (D. Kan. 2004).

name on it. The bus driver told Detective Martin at that point that the bag belonged to Lira. Martin denied that the driver had given him any previous indication that this was the defendant's bag, or even that the defendant had a bag in the compartment.

Meanwhile, Officer Padron spoke to several people on the bus, asking their names and asking for identification. He noticed that defendant Lira was watching a movie and did not glance up as Padron came by. He also noticed that Lira had sweat all over his forehead and lip, and that he was wearing a heavy coat. Padron talked to him and asked him for some identification.

Detective Martin came back in the bus and asked Officer Padron, who is fluent in both Spanish and English, to check with passengers to see who had the claim check that matched the bag. Padron asked whether he meant to ask the whole bus, and Martin said yes. Padron was standing just to the side and back of Mr. Lira, and he asked Lira if he had a claim check. Lira said yes and produced the matching No. 6800 ticket from his pocket.

Detective Martin told Lira the dog had indicated on his bag, and Martin asked Lira if he could search the bag. Lira said he could. Martin (as well as Padron) conversed with Mr. Lira in English, and the defendant had no difficulty understanding or communicating in English. They exited the bus, and Martin asked Lira if the red bag was his. Lira said it was. Martin opened the bag and found a brick-shaped object inside a pair of pants in the bag. He opened up the object, which was heavily wrapped with electrical tape, and found it contained a white powder. Officers arrested Mr. Lira at that point and put him in handcuffs.

Detective Martin testified he was unsure of the total amount of time it took from the initial stop of the bus until the search of the bag, but the evidence suggests it was likely a total of

about 15 minutes.

II. *Motion to Suppress*.

Defendant's motion contends there was no traffic violation and that the initial stop of the bus was unlawful. Even if there was a violation, the motion asserted that detaining a tour bus to search baggage and to investigate passengers is "beyond the lawful scope and duration of a traffic stop for failure to use a turn signal." Doc. 16 at 3. Defendant contends there was no reasonable suspicion of criminal activity to justify a detention. He also disputes whether the bus driver consented to a search (apparently because the circumstances were allegedly too coercive and any consent was therefore not voluntary, *see id.* at 4) and further argues that a bus driver's consent "is of no consequence under the Fourth Amendment." Lastly, defendant challenged whether the dog used by the officer was sufficiently reliable. At the conclusion of the evidence, the defense further argued that the stop and search of the bus was a result of a "collaboration" between the police and the bus owner. Defendant contends this collaboration "dissolved" his rights as a passenger, and he argues that the resulting detention and search violated his Fourth Amendment right to be free from unreasonable searches and seizures.

The Government's response asserted that the defendant lacked a reasonable expectation of privacy in the bus and therefore lacked standing to object to the search. Doc. 20 at 4. It alleged that the officer saw a traffic violation and that the initial stop was therefore reasonable. *Id*. at 5. It asserted that the officer had probable cause to search the bag once the dog alerted to the presence of narcotics. *Id*. At the conclusion of the evidence, the Government further argued that the evidence showed there were two valid reasons to stop the bus: a traffic violation and the consent of the owner of the bus line. It further argued that the driver gave a valid consent for the

search, that the officer had probable cause for a search once the dog alerted, and that the defendant subsequently gave a valid consent for the search of the bag.

III. _Discussion_.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."

A person is "seized" when an officer, by means of physical force or a show of authority, terminates or restrains the person's freedom of movement through means intentionally applied. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention quite brief. *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (*citing Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). The passengers in a vehicle are likewise seized in the course of a traffic stop, because a reasonable person in such circumstances would not feel to leave or to otherwise terminate the encounter without police permission. *Brendlin*, 127 S.Ct. at 2407-08. Thus, for the duration of a traffic stop, a police officer effectively seizes "everyone in the vehicle." *Arizona v. Johnson*, 129 S.Ct. 781, 784 (2009). A passenger therefore has standing to challenge a stop's constitutionality. *Id.* at 787.

Under Tenth Circuit law, traffic stops are ordinarily analyzed under the standards for investigatory stops announced in *Terry v. Ohio,* 392 U.S. 1 (1968). *See United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir.1998). The reasonableness of such stops are evaluated in two respects: first, whether the officer's action was justified at its inception, and, second, whether the stop was reasonably related in scope to the circumstances that first justified the

interference. *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994).

A traffic stop is justified at its inception if an officer has probable cause to believe a traffic violation has occurred. *See United States v. Martinez*, 512 F.3d 1268, 1272 (10th Cir. 2008). The court finds from the evidence that Detective Martin witnessed a traffic violation when the bus driver failed to properly signal a turn. The officer was clear and unequivocal in his testimony about the violation, and the court sees no basis to question that testimony. Defendant claims the officer's testimony was fabricated. It is clear from the evidence that the officer's real interest lay in investigating the defendant for possible drug trafficking, not in following up on any traffic violation by the driver.[2] In fact, the officer appeared to concede on cross-examination that he that he intended to stop the bus regardless of the violation. Nevertheless, the officer's underlying motivation does not undermine the credibility of his testimony about what he saw, which was the only evidence presented on that issue. The court rejects defendant's suggestion that the distance from the alleged violation to the point where the bus was pulled over indicates the officer's testimony was false. The officer explained that he was talking on the radio or on the phone with several officers while he was following the bus, and that it may have taken some time for him to turn on his lights and for the bus to pull over. The officer turned on his emergency lights, which was a show of authority that prompted the bus driver to pull over.[3]

---

[2] For purposes of Fourth Amendment, the officer's subjective motives for making the stop are irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996).

[3] Unlike *United States v. Drayton*, 536 U.S. 194 (2002) and *Florida v. Bostick*, 501 U.S. 429 (1991), the bus in this case was not parked for a scheduled stop when the officers boarded it. Rather, it was driving down the street and was pulled over through a show of authority. The court concludes that the driver and the passengers in the instant case were thus "seized" within the meaning of the Fourth Amendment.

Under the circumstances, the court concludes that the initial stop was reasonable under the Fourth Amendment because it was based upon an observed traffic violation.[4]

If a traffic stop was justified at its inception, the court must determine whether the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place. *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir 2009). "A traffic stop must be 'temporary and last no longer than is necessary to effectuate the purpose of the stop'; after the brief detention required to achieve that purpose, the motorist must be allowed to continue on his or her way." *See United States v. Montes*, 280 Fed.Appx. 784, 789 (10th Cir. 2008) (citing *Florida v. Royer*, 460 U.S. 491 (1983)). An officer may not extend a traffic stop beyond a reasonable duration necessary to accomplish the purpose of the stop unless the driver consents to further questioning or the officer has reasonable suspicion to believe other criminal activity is afoot. *United States v. Rice*, 483 F.3d 1079, 1083-84 (10th Cir. 2007).

The evidence in this case that showed after a very brief discussion with the driver about the failure to signal, Detective Martin asked the driver for permission to search the baggage compartment. The driver readily consented to a search. The evidence showed the driver was aware of the police plan to investigate Mr. Lira; in fact the driver helpfully pointed out that the

[4] In view of this finding, the court need not address the Government's additional claim that the stop was justified because the owner of the bus line consented to the stop. The court notes that Detective Martin and Mr. Mares apparently contemplated that the police would board the bus while it was stopped at the restaurant parking lot. *Cf. United States v. Drayton*, 536 U.S. 194 (2002) (officers did not seize bus passengers when they boarded bus at rest stop and began asking passengers questions). *See also United States v. Hernandez-Zuniga*, 215 F.3d 483, 486 (5th Cir. 2000) (evidence presented that bus company consented to and encouraged border patrol agents to pull over its buses for immigration inspections). There was no evidence that Martin and Mares specifically discussed stopping the bus on the road. *Cf. United States v. Guerrero,* 472 F.3d 784, 789 (10th Cir. 2007) (consent must be unequivocal and specific).

man they were looking for was on the bus. The driver was also aware that Mr. Mares had talked with the police and had given his approval for an investigation. The court concludes that Mr. Mares voluntarily gave his approval for the police to board the bus and to do what they thought necessary to investigate. The court further finds that the driver voluntarily consented to a detention of the bus and to a search of the baggage compartment. Clearly, the officer's question about searching the compartment was unrelated to the traffic infraction that justified the stop. Under prior Tenth Circuit law, that fact might have rendered the seizure unreasonable. *See e.g.*, *United States v. Wilson*, 96 Fed.Appx. 640, 644, n.3 (10th Cir. 2004) ("[T]he reason an officer may not ask for consent to search a vehicle during a routine traffic stop is because such a request exceeds the permissible scope of the stop...."). But after *Muehler v. Mena*, 544 U.S. 93 (2005), the issue is whether an officer's question *extended the time* reasonably required to complete the traffic stop, not whether the officer's question related to the initial justification for the stop. In *United States v. Valenzuela*, 494 F.3d 886, 890 (10th Cir. 2007), the court found it was reasonable for an officer making a traffic stop to ask the driver whether the car had any weapons or "other illegal items."[5] The court said:

> Defendant argues Detective Baxter's questioning prolonged the length of the stop because Detective Baxter allegedly abandoned investigation of the traffic offense and immediately asked Defendant questions unrelated to the traffic infraction. In other words, according to Defendant, Detective Baxter was only permitted to ask questions unrelated to the traffic stop while he was writing out a ticket, waiting for dispatch, or conducting some other investigative procedure related to the initial purpose of the

---

[5] The officer also followed up by asking for permission to search. The court found this question was reasonable in light of the driver's equivocal answer as to whether there were firearms in the car and because of the strong interest in protecting an officer's safety. *Valenzuela*, 494 F.3d at 890.

> stop.
>
> We do not believe our precedent requires such a narrow approach. Our cases do not focus on the order of events. Rather, our cases focus on the reasonableness of the traffic stop in light of both the length of the detention and the manner in which it was carried out. [cite omitted]. In this case, Detective Baxter's question regarding the presence of other "illegal items" did not appreciably lengthen the duration of the stop. The officer's inquiry required a simple yes or no answer and could not have taken more than two or three seconds to ask. That Detective Baxter did not ask the question while actively processing Defendant's traffic infraction does not render Defendant's momentary detention unreasonable.

*Id*. Thus, "officers may ask questions outside the scope of the traffic stop so long as the questions do not appreciably prolong the length of the stop." *Id*. (citing *United States v. Alcaraz-Arellano*, 441 F.2d 1252 (10th Cir. 2006)). This includes a request for consent to search. *Valenzuela*, 494 F.3d at 891, n.2.

Similar reasoning applies here. Martin's request to search took a matter of seconds, and the driver readily consented to the search. The request for consent, in and of itself, did not appreciably extend the duration of the traffic stop. Moreover, Martin had good reason to believe that the owner of the bus wanted a search to be conducted, and that the driver who had custody of the bus was willing to consent to a search. The officer was investigating a tip from the owner that a passenger might be using the bus for an illegal purpose. The tip was admittedly short on specifics and did not necessarily indicate criminal activity. But it did provide an independent factual basis that gave the officer reason to ask whether the driver would consent to a search of the bus. The court concludes that the officer's request for permission to search did not amount to an unreasonable seizure of the driver or of the bus under the Fourth Amendment.

The driver's consent resulted in the detention of all the passengers aboard the bus,

including the defendant. Defendant argues that under the Fourth Amendment, the driver's consent cannot justify a detention of all the passengers. In *United States v. Hernandez-Zuniga*, 215 F.3d 483 (5th Cir. 2000), the defendant was a passenger aboard a bus that was stopped by U.S. Border Patrol agents. The evidence showed that the owner of the bus had given prior consent for the Border Patrol to make such stops. The court noted that the reasonableness of such a seizure depends on a weighing of the public interests and the individual's right to personal security free from arbitrary interference by law enforcement officers. *Id.* at 487. The court observed:

> By purchasing a bus ticket from VTC [the bus company] and boarding its bus, Hernandez relinquished to VTC a substantial amount of control over his movement. Although the ticket gave Hernandez some expectations regarding the bus's movement – namely that it would transport him from Brownsville to Houston – VTC retained control over what route the bus would take, the speed the bus would travel, and when and where and for how long the bus would stop along the way. Specifically, the evidence shows that VTC retained the right to stop en route to pick up any passenger who flagged down a bus.

*Id*. The court contrasted the defendant's situation with a taxicab passenger, who typically contracts for both the right to exclude others from the cab and to control the cab's destination. *Id*. at 488 (citing *United States v. Woodrum*, 202 F.3d 1 (1st Cir. 2000)). By contrast:

> Hernandez could neither exclude others nor direct that the bus driver would take a particular route. He could not order that the bus continue moving toward its destination despite a driver-determined reason to stop. At the minimum, given that a VTC bus may make any number of stops to pick up passengers, it is reasonable to conclude that Hernandez assumed the risk that the bus would make unplanned stops, as well as the risk that during these stops the bus might be boarded by Border Patrol agents.

*Hernandez-Zuniga*, 215 F.3d at 488. After weighing the various factors, the court found that

"[i]n light of VTC's voluntary consent, and considering the public benefits of the stop as opposed to the intrusion upon the rights of the individual bus passenger, the balance tips in favor of finding the stop reasonable." *I*. at 489. Thus, "when a commercial bus company having a policy of making random, unplanned stops to pick up passengers consents to random stops and immigration inspections of its buses by the Border Patrol, a stop conducted in accordance with that consent does not violate the bus passengers' Fourth Amendment rights." *Id*.

In the instant case, the defendant paid for a seat, which gave him a contractual right to ride the bus from Wichita to its destination. But he had no right to determine the route the bus would travel; to determine when, where or why the bus would make stops; or to determine who would be allowed to enter or be excluded from the bus. Control over all of those determinations was in the bus company and its agents, including the driver. As a bus passenger, the defendant could have no reasonable expectation that he could refuse or override the bus company's consent, if the company were so inclined, to stop the bus, to allow police officers to enter and ask questions, or to allow the police to detain the bus while they looked in areas in which the defendant did not possess a reasonable expectation of privacy, such as the baggage compartment. Absent a showing of some other arrangement, the owner of a bus such as this would ordinarily be expected to retain all the rights of ownership not inconsistent with the contract of carriage, including the right to allow police to search common areas of the bus. The court recognizes there are some differences between the instant case and *Hernandez.* For example, there is no evidence that the Mares bus line regularly made random stops to take on passengers, and there was no evidence that a stop of this type would further the public interest in enforcing immigration laws. And a detention and search by police following a traffic stop would likely

cause some surprise and concern among bus passengers who were detained as a result of a bus company's decision to permit a search. On the other hand, a detention of the passengers pursuant to the bus company's consent would further the public interest in preventing passengers from using the bus as a means of transporting contraband, and would arguably further the security and safety of passengers and bus employees. And as noted previously, this was not a random request and search; it was prompted by the bus company's own concern that the bus was being used in criminal activity, and the owner voluntarily reached out to the police to request an investigation. Lastly, the evidence showed that the detention was brief and was limited to the scope of the consent given. From the initial stop to the finding of the powder in the defendant's bag took no more than 15 minutes. Under the circumstances, the court concludes that the detention of the defendant while the bus was searched pursuant to the voluntary consent of the bus driver was reasonable under the Fourth Amendment.

The court further concludes that the officer's visual examination of the baggage compartment and the dog sniff conducted in that compartment did not violate the defendant's Fourth Amendment rights. In *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978), the Court found that a search of a vehicle did not violate the passengers' rights because they failed to show that they had "any legitimate expectation of privacy in the glove compartment or other area of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." Similarly, defendant Lira had no reasonable expectation of privacy in the baggage compartment of the bus. Although he was allowed to store his bag in the compartment, there is no showing that he had any right to exclude others from the compartment. *See United States v. Ventura*, 447

F.3d 375, 380 (5th Cir. 2006) ("Ventura had no reasonable expectation of privacy in the exterior luggage compartment of a commercial bus, and therefore no standing to contest the actual inspection of that compartment, to which the bus operator consented."). The defendant did, of course, have a reasonable expectation of privacy in the contents of his bag. *Bond v. United States*, 529 U.S. 334, 338-39 (2000). But a dog sniff of the type conducted here, which only serves to detect an odor of contraband emitted outside the bag, does not constitute a "search" within the meaning of the Fourth Amendment. *United States v. Place*, 462 U.S. 696, 707 (1983). The evidence showed that the dog and his handler were properly certified to detect the odor of certain narcotics with a high degree of reliability. The court finds the officer had probable cause to believe the red bag contained evidence of a crime after the dog indicated on it. *See United States v. Forbes*, 528 F.3d 1273, 1277 (10th Cir. 2008). Moreover, because the bag was being transported on a bus, the officer was authorized at that point to search the bag pursuant to the "automobile exception" to the warrant requirement. *California v. Acevedo*, 500 U.S. 565, 579 (1991). After having probable cause to search the bag, Detective Martin was informed by the driver that the bag belonged to the defendant. The officer had reasonable suspicion (if not probable cause) at that point to detain the defendant to investigate whether he was transporting drugs. Martin returned to the bus, where he had Officer Padron ask whether the defendant had the claim check for the bag. The defendant produced the check. By that point the officers clearly had probable cause to arrest the defendant. Despite the officers' authority to search the bag without consent, the evidence shows that they nevertheless requested consent from the defendant and that he voluntarily consented to let them search the bag.

Considering all of the circumstances, the court concludes that the detention of the

defendant and the search of his bag were reasonable within the meaning of the Fourth Amendment.

IV. *Conclusion*.

The defendant's Motion to Suppress (Doc. 16) is DENIED. Defendant's Motion for Discovery of K-9 Information (Doc. 17) is GRANTED in PART and DENIED in PART. IT IS SO ORDERED this 22nd Day of May, 2009, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge